Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Southern District of New York                    1:19-cv-09227-LLS

| | |
|---|---|
| Quincy Steele, Jimmy Arriola, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| - against - | First Amended Complaint |
| Wegmans Food Markets, Inc., | |
| Defendant | |

Plaintiffs by attorneys allege upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.      Wegmans Food Markets, Inc. ("defendant") manufactures, distributes, markets, labels and sells ice cream purporting to contain flavor only from its natural characterizing flavor, vanilla, under the Wegmans brand ("Product").

2.      The Product is available to consumers from defendant's retail stores and is sold in sizes including cartons of 1.5 Quarts.

3.      The Product's relevant front label representations include the "Wegmans," "Food

You Feel Good About," "No Artificial Colors, Flavors or Preservatives," "Vanilla Ice Cream" and "Made with Milk, Cream and Natural Vanilla Flavor."



4.     The designation of a food as "Vanilla Ice Cream" has been understood by consumers for over 50 years to identify a product where (1) vanilla is the characterizing flavor, (2) vanilla is contained in a sufficient amount to flavor the product, (3) the flavor is derived from vanilla extract or vanilla flavoring, (4) no other flavors simulate, resemble, reinforce, extend or enhance flavoring from vanilla or permit less real vanilla to be used and (5) vanilla is the exclusive source of flavor.

5.     Defendant's Product contains non-vanilla flavor, a *de minimis* amount of vanilla and to the extent it tastes like vanilla, such flavor is contributed by vanillin from non-vanilla sources.

6.     The Product is not truthfully or lawfully identified as "Vanilla Ice Cream" which misleads consumers.

I.     Vanilla is Perennial Favorite Ice Cream Flavor

7.     Ice cream is a year-round treat enjoyed by 96% of Americans.[1]

8.     Its popularity is attributed "to the perfect combination of elements – sugar, fat, frozen

---

[1] Arwa Mahdawi, The big scoop: America's favorite ice-cream flavor, revealed, The Guardian, July 11, 2018

water, and air – that make up the mouthwatering concoction."[2]

9.    Until the early 1990s, any product named "ice cream" had to meet requirements of "not less than 10 percent milkfat, nor less than 10 percent nonfat milk solids."[3]

10.    Vanilla is the consistent number one flavor for ice cream for 28% of Americans, confirmed two groups who would know – the International Dairy Foods Association (IDFA) (ice cream producers) and National Ice Cream Retailers Association (ice cream parlors).

11.    The reasons for vanilla's staying power are "not only because it is creamy and delicious, but also because of its ability to enhance so many other desserts and treats."[4]

12.    By some estimates, approximately two-thirds of "all ice cream eaten is either vanilla or vanilla with something stirred into it, like chocolate chips."[5]

13.    The applications of vanilla ice cream include its centerpiece between chocolate wafers ("sandwich"), enrobed in chocolate on a stick ("bar"), topping a warm slice of fresh-baked pie ("à la Mode"), drizzled with hot fudge, sprinkled with crushed nuts and topped by a maraschino cherry ("sundae") or dunked in a cold frothy glass of root beer ("float").[6]

A.    Philadelphia (American)-style Ice Cream v. French Ice Cream

14.    In the development of ice cream, the two main types were Philadelphia (American)-style and French ice cream, flavored of course, with vanilla.

15.    Like many confections, ice cream was brought here from France, courtesy of two statesmen who served as ambassadors to that nation:  Thomas Jefferson and Ben Franklin.

---

[2] Vox Creative, The Reason You Love Ice Cream So Much Is Simple: Science, Eater.com, October 12, 2017.
[3] 21 C.F.R. § 135.110(a)(2).
[4] Press Release, IDFA, Vanilla Reigns Supreme; Chocolate Flavors Dominate in Top Five Ice Cream Favorites Among Americans, July 1, 2018
[5] Bill Daley (the other one), Which vanilla ice cream is the cream of the crop? We taste test 12 top brands, Chicago Tribune, July 18, 2018
[6] The True Wonders of Vanilla Ice Cream, FrozenDessertSupplies.com.

16.     While these two Founding Fathers could agree on the terms of the Declaration of Independence and Constitution, they could not agree about the superior type of vanilla ice cream.

17.     President Thomas Jefferson was a partisan of the egg yolk base, describing this treat as "French ice cream."[7]

18.     The French reliance on egg yolks to reduce the amount of butterfat and cream used was not due to taste, but to the limited dairy production and relative abundance of hens.

19.     Dr. C. L. Alsberg, head of the Bureau of Chemistry, U.S. Department of Agriculture, highlighted the differences between these varieties in a 1914 hearing:

> the early French records, the cook books, never made ice cream from cream alone. It was not until ice cream was introduced into England that it was ever made of dairy cream sweetened and flavored and frozen. The French always used cream and eggs or cream and milk and eggs and sugar, with fruits or starches or anything that would make a custard.[8]

20.     Besides the use of eggs, another difference was "that the American ice cream is raw. And the French as a rule is cooked."[9]

21.     The egg yolk solids, when mixed with vanilla, distinguish a "French" vanilla ice cream from its Philadelphia-style counterpart by providing a: [10]

- smoother consistency and silkier mouthfeel;

- caramelized, smoky and custard-like taste; and

- deep-yellow color.[11]

---

[7] Thomas Jefferson's Handwritten Vanilla Ice Cream Recipe, Open Culture, July 13, 2014; Thomas Jefferson's Vanilla Ice Cream, Taste of Home, June-July 2012; Thomas Jefferson's Original Vanilla Ice Cream Recipe, Jefferson Papers, Library of Congress; Anna Berkes, "Ice Cream" in Thomas Jefferson Encyclopedia, Thomas Jefferson Foundation, Inc., Monticello.org, June 28, 2013.

[8] Report of Hearing on Ice Cream Before Dr. C. L. Alsberg, Chief of the Bureau of Chemistry, U.S. Department of Agriculture, February 10, 1914 and March 7, 1914, Subject: The Use of Colloids as Stabilizes in Ice Cream, the Butter Fat Standard for Ice Cream and the Bacteriology of Ice Cream, with Special Reference to the Cincinnati Ice Cream Cases. Published by The National Association of Ice Cream Manufacturers, June 1914 at p. 19 ("Alsberg Hearings").

[9] Alsberg Hearings, Testimony of Mr. Lewis, General Manager, J. M. Horton Ice Cream Co. at p.33.

[10] The descriptor "French" or "french" preceding "vanilla" does not modify the word "vanilla."

[11] Sheela Prakash, What's the Difference Between Vanilla and French Vanilla Ice Cream?, The Kitchn, June 7, 2017.

22. Due possibly to Jefferson's efforts at popularizing this variety, ice cream with 1.4% or more egg yolk solids as part of its base is referred to as "french ice cream."[12]

23. Meanwhile, during the sweltering summer of the Constitutional Convention of 1787, Ben Franklin's "crème froid" or "cold cream" served as a refreshing break for the delegates debating this nation's future.[13]

24. Ever the tinkerer, Franklin adapted his ice cream to the environment by relying on the abundance of dairy farms in the Philadelphia region, the lack of hens to provide the egg yolk base and foregoing the cooking step, to more quickly produce this refreshing treat for the delegates.[14]

I. Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

25. The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[15]

26. Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[16]

27. Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to

---

[12] 21 C.F.R. § 135.110(f)(1) ("The name of the food is 'ice cream'; except that when the egg yolk solids content of the food is in excess of that specified for ice cream by paragraph (a) of this section, the name of the food is 'frozen custard' or 'french ice cream' or 'french custard ice cream'.)

[13] R. Berley, A Treatise on the History of Ice Cream in Philadelphia, The Franklin Fountain; Julia Reed, Ice cream two ways: A tale of two continents, King Arthur Flour, Blog, Aug. 24, 2018; *but see* Jeff Keys, Ice Cream Mix-ins, N.p., Gibbs Smith (2009) at 14.

[14] Vanilla Ice Cream, Philadelphia-Style, The Perfect Scoop, Epicurious.com, Dec. 2011; Dr. Annie Marshall, Vanilla Bean Ice Cream Two Ways, and Ice Cream Basics, July 8, 2011, Everyday Annie Blog ("Varieties of ice cream generally fall into two main categories: Philadelphia-style or French-style.  Philadelphia style ice creams are quicker and simpler, with a heavy cream/milk mixture for the base.  French-style ice creams have a custard base, with cooked egg yolks to help achieve a creamy texture and rich flavor.").

[15] 21 C.F.R. §169.3(c).

[16] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

"protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[17]

28.   It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[18]

29.   This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

30.   Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[19]

31.   Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.   <u>Food Fraud as Applied to Vanilla</u>

32.   Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide

---

[17] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[18] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein,  "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[19] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?, Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany," Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

variability of quality and value of vanilla flavorings," second only to saffron in price.[20]

33.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[21]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[22]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high-quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |

---

[20] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[21] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[22] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component

- Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla

- "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[23]

➢ Compounding, Diluting, Extending

- Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[24]

- "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark

➢ Addition of fillers to give the impression there is more of the product than there actually is

- Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list

➢ Ingredient List Deception[25]

  o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

  o "natural vanilla flavorings" – "-ing" as suffix referring

---

[23] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.

[24] Berenstein, 423.

[25] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

to something *like* that which is described

- o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food

- o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor

- o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

34.     The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

> *The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[26]

II.     Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

35.     The "flavor industry" refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

36.     The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[27]

37.     Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products

---

[26] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).
[27] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

contained *only* vanilla.

38.     These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

A.     Attempts to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

39.     The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices paid to the farmers.

40.     However, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla plants and produce palm oil under the pretense of "crop diversification."

41.     Other tactics include "phantom bidding," where "deep-pocketed" saboteurs claim they will pay a higher price to small producers, only to vanish, leaving the farmers forced to sell at bottom dollar to remaining bidders.[28]

42.     The reasons for these counterintuitive actions is because the flavor industry benefits from high vanilla prices and the use of less real vanilla.

43.     When less vanilla is available, the customers of the flavor companies – food manufacturers – must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.     Use of Vanilla Compound Ingredients to Replace and Provide Less Vanilla

44.     Though flavor companies will not admit their desire to move off real vanilla, this conclusion is consistent with the comments of industry executives.

45.     According to Suzanne Johnson, vice president or research at a North Carolina

---

[28] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

46.    The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

47.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[29]

48.    These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including "naturally produced vanillin," potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[30]

49.    The numerous "naturally produced vanillins" are just as potent as their synthetic predecessors, such that "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[31]

50.    Since only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

51.    The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s, but the last 10 years have seen the proliferation of this ingredient.

C.    Decline of Industry Self-Governance

---

[29] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[30] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., Food chemistry and nutritional biochemistry. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That Seem[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).
[31] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

52.    That high-level executives in the flavor industry are willing to boast of their stratagems to give consumers less vanilla for the same or greater price is not unexpected.

53.    The once powerful and respected trade group, The Flavor and Extract Manufacturers Association ("FEMA"), abandoned its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

54.    FEMA previously opposed industry efforts to deceive consumers but cast the public to the curb in pursuit of membership dues from its largest members, such as Unilever and Danone.

III.    Congress Debates Ice Cream Flavor Labeling and Expresses Support for Vanilla Flavor Being Provided by Vanilla Beans

55.    Even before ice cream standards were established, Congress framed the central question for ice cream flavoring as whether the flavor source was entirely derived from the characterizing flavor – i.e., raspberry for raspberry ice cream, vanilla for vanilla ice cream.

56.    The focal point for the debate was how to label vanilla ice cream which was flavored with added vanillin from clove oil, a natural source material.

57.    Why, industry asked Congress, could they not label their products as "vanilla ice cream" if it contained vanillin from sources other than vanilla beans?

58.    In response, Congressmen E.A. Kenny of New Jersey and Virgil Chapman of Kentucky inquired of ice cream's representative, Mr. Schmidt:

| Mr. Kenney: | Do you not think, though, Mr. Schmidt, that if you label it vanilla ice cream, it ought to be vanilla; and if it is made with vanillin extracted from oil of cloves, you ought to label it manufactured with such vanillin? |
|---|---|
| Mr. Schmidt: | Well, we, of course, do not think so. That is why we are here making our protest. We think, after all, the consuming public is accustomed to accepting as vanilla artificial vanillas. |
| Mr. Kenney: | *We agree that Barnum educated us along that line a long time ago.* (emphasis added) |

……………

Mr. Chapman: I do think that if it is chocolate it ought to be labeled "chocolate"; and if it is flavored with vanillin made from oil of cloves, it ought to be labeled to show that it is flavored with vanillin made from oil of cloves; and if it is flavored with vanilla, it ought to be labeled "vanilla"; and if it is " flavored with lemon, it ought to be labeled "lemon "; and if it is cherry, it ought to be labeled "cherry."

59.     Later in the hearing, Mr. Chapman and another industry representative engaged over

the proper declaration of flavor for ice cream:

Mr. Chapman:      Do you make raspberry?

Mr. Hibben:       Yes.

Mr. Chapman:      And you put that on the label?

Mr. Hibben:       We say "raspberry ice cream."

Mr. Chapman:      And if it is peach, you put that on the label?

Mr. Hibben:       It Is peach ice cream; yes.

Mr. Chapman:      And If you call it vanilla, what do you put on?

Mr. Hibben:       We put "vanilla ice cream" on our labels. That is what we want to continue to do. We want to put vanilla on those labels.

Mr. Chapman:      But you say you put in It oil of cloves instead of vanilla.

Mr. Hibben:       We do not use cloves. We use vanillin derived from the oil of cloves.

Mr. Chapman:      If you put out strawberry ice-cream, you would not want to use raspberry to make it, would you?

Mr. Hibben:       No; but we use vanillin, which is an ingredient of the vanilla bean and, its true to name.

Mr. Chapman:      Is it an extract from the vanilla bean?

Mr. Hibben:       It is both. It is taken both from the eugenol and the vanilla bean and is the same product. If you were a chemist you could not tell the difference, and if you

13

were a doctor, you would say that one is just as
harmless as the other.

Mr. Chapman:     I do not object to buying artificial vanilla ice cream if
it is pure, but if it is artificial. I would like to know
what I am getting.[32]

IV.     Three Categories of Ice Cream Clearly Distinguish those Flavored Only with Vanilla

60.     Daphna Havkin-Frenkel, editor of the *Handbook of Vanilla Science and Technology*,
and a leading scholar and researcher on vanilla, summarized the flavoring requirements in the
context of ice cream flavored by vanilla:[33]

> There are three categories of vanilla ice cream, as defined by the FDA
> Standard of Identity. Vanilla ice cream Category I contains only vanilla
> extract. Vanilla ice cream Category II contains vanilla made up of 1 oz
> of synthetic vanillin per 1 gallon of 1-fold vanilla extract. Vanilla ice
> cream Category III contains synthetic ingredients.

61.     Carol McBride, U.S. vanilla category manager for global flavor giant Symrise, noted
these requirements and their effect on consumers: "If the flavor comes partially or fully from
another source, the company must stamp 'vanilla flavored' or 'artificial vanilla' on the front of the
package, a likely turnoff to consumers."[34]

62.     The ice cream standard of identity, 21 C.F.R. § 135.110, established in the early
1960s "provided for a system for designating characterizing flavors in ice cream which has come
to be referred to as the '3 category flavor labeling.'"  Exhibit "A," Letter from Taylor M. Quinn,
Associate Director for Compliance, Bureau of Foods, to Glenn P. Witte, International Association
of Ice Cream Manufacturers, May 31, 1979 ("Quinn Letter, May 31, 1979").[35]

---

[32] One of the reasons for the emphasis on flavor derived from the characterizing flavor was ice cream's status as a
high value, expensive product, made mainly from milk and cream.  The use of ersatz flavoring lowered the quality of
an otherwise valued item.
[33] Daphna Havkin-Frenkel and Faith C. Belanger, eds., *Handbook of Vanilla Science and Technology*, Wiley, 2018
(221).
[34] Melody M. Bomgardner, "The problem with vanilla," Chemical & Engineering News, Sept. 12, 2016.
[35] The attached exhibits have not previously been available to the public.

63.    The requirements "recognize[s] three distinct types of ice cream, based on the use of natural and various combinations of natural and various combinations of natural and artificial flavors that characterize this food." Exhibit "A," Quinn Letter, May 31, 1979; *see* 21 C.F.R. § 135.110(f)(2)(i)-(iii); 21 C.F.R. § 135.110(f)(3)-(5).

64.    The Product is represented as a Category 1 product because "the name on the principal display panel or panels of the label" is "accompanied by the common or usual name of the characterizing flavor, e.g., 'vanilla.'"

"Vanilla Ice Cream"



65.    However, a Category 1 ice cream "contains no artificial flavor." 21 C.F.R. §135.110(f)(2)(i).

66.    The Product's front label also states "No Artificial Colors, Flavors or Preservatives," which is false, deceptive, misleading and contrary to law.

67.    Defendant's front label evinces what Dr. Mark Black stated in his 2006 article published for the first Vanilla International Congress in 2006:

There has been longstanding confusion within the U.S. food industry about how vanilla is defined for use in vanilla ice cream products.

Exhibit "B," p.3, "The Use of Vanilla in Ice Cream: Rules, Regulations and Interpretations – All Are Needed For A Thorough Understanding."

68.    The failure to understand – or to willfully disregard – the regulations for ice cream begins with failing to realize that "The general flavor regulations [21 C.F.R. § 101.22] are not applicable to this standardized food," ice cream [21 C.F.R. § 135.110(f)(2)-(5)].  Exhibit "A," Quinn Letter, May 31, 1979.

69.    The "designation of a characterizing flavor for category I ice cream is based on the premise that only natural flavor derived from the product whose flavor is simulated may be used." *see* Quinn Letter, May 31, 1979 .

70.    In other words, "a product identified as 'Vanilla Ice Cream' is subject to the category I ice cream requirements and, therefore, must contain only the characterizing flavor derived from vanilla beans." Exhibit "C," Letter from J.L. Summers, Assistant to the Director, Division of Regulatory Guidance, Bureau of Foods to David B. Daugherty, Zink & Triest Company, Inc., April 10, 1979  ("Summers Letter, April 10, 1979")

71.    The ice cream flavor designations were "established long before the development of the general flavor regulations published under 21 CFR 101.22." Exhibit "C," Summers Letter, April 10, 1979 ("Consequently, the labeling requirements for the declaration of flavors in the name of ice cream are specifically provided for by the standard and is separate and apart from the general flavor regulations.").[36]

72.    That the Product contains flavor from sources other than the characterizing natural flavor can be confirmed because the front label from the ingredient list, identifying "Natural

---

[36] Compare 21 C.F.R. § 135.110(f)(2)-(5) with 21 C.F.R. § 101.22; J.L Summers personally confirmed the contents of his correspondence indicated here to plaintiff's counsel.

Flavor" as the flavoring ingredient.[37]

<u>Ingredient List</u>

Milk, Cream, Corn Syrup, Liquid Sugar, Skim Milk, Buttermilk, Milkfat, Whey, Natural Flavor, Mono- and Diglycerides, Guar Gum, Cellulose Gum, Carrageenan, Dextrose, Annatto (color).

Milk, Cream, Corn Syrup, Liquid Sugar, Skim Milk, Buttermilk, Milkfat, Whey, Natural Flavor, Mono- and Diglycerides, Guar Gum, Cellulose Gum, Carrageenan, Dextrose, Annatto (color).

73.    Because the front label indicates the Product is "Vanilla Ice Cream" and "Made With…Natural Vanilla Flavor," consumers expect the flavor to only come from vanilla beans. Exhibit "C," Summers Letter, April 10, 1979 ("the flavor agent for vanilla ice cream (a category I product) is limited to vanilla bean and/or flavor derived from vanilla beans")

74.    Highlighting "Natural Vanilla Flavor" on the front panel but listing "Natural Flavor" on the ingredient list reveals that the former is part of "a flavor blend (other natural flavors) in category I ice cream" which contains non-vanilla flavors.  Exhibit "C," Summers Letter, April 10, 1979.

75.    Because the Product is "identified as 'Vanilla Ice Cream,' [it] is subject to the category I ice cream requirements and, therefore, must contain only the characterizing flavor derived from vanilla beans."  Exhibit "C," Summers Letter, April 10, 1979.

76.    A category 1 vanilla ice cream is also required to identify the common name for a vanilla ingredient "vanilla extract" or "vanilla flavoring", this reveals it is not a Category 1 ice cream.

77.    This means a company cannot use the term "natural flavor" but at the same time claim this is an exclusively vanilla ingredient.

78.    The requirement is expressed in 21 U.S.C. §343(g):[38]

---

[37] https://shop.wegmans.com/search?search_term=vanilla%20ice%20cream
[38] 21 U.S.C. § 343(g)(2) read with 21 C.F.R. § 135.110(f)(2)(i) and 21 C.F.R. §§ 169.175 – 169.178.

A food shall be deemed to be misbranded –

(g) Representation as to definition and standard of identity

If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341 of this title, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.

79.    The "common names of optional ingredients" in ice cream are those ingredients the manufacturer chooses to use to provide flavor, such as strawberries, peaches or vanilla extract.

80.    This statute's requirements are further specified by the ice cream regulations, which require its ingredients to be identified "as required by the applicable sections of parts 101 and 130" of the regulations. *See* 21 C.F.R. § 135.110(g).

81.    Part 101 states:

Ingredients required to be declared on the label or labeling of a food, including foods that comply with standards of identity, except those ingredients exempted by 101.100, shall be listed by common or usual name.

21 C.F.R. § 101.4(a)(1)

82.    Vanilla extract and vanilla flavoring are the only flavor that have standards of identity and are required to be identified by these names, which lets consumers know what they are getting. *See* 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of vanilla'."); *see also* 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'").

83.    Flavorings other than vanilla "shall be declared according to the provisions of 101.22." 21 C.F.R. § 101.4(b)(1).

84.    21 C.F.R. § 101.22 dictates that

(h) The label of a food to which flavor is added shall declare the flavor in the statement of ingredients in the following way:

(1) Spice, natural flavor, and artificial flavor may be declared as "spice", "natural flavor", or "artificial flavor", or any combination thereof, as the case may be.

85.    Dr. Black summarized the issues, noting:

The ice cream nomenclature rules, on their own, provide great latitude, thus confusion, in their interpretation.

For example, the statement that Vanilla Ice Cream (Category I) contains no artificial flavor could be interpreted as the same as a natural flavor, as defined in the flavor rules (21 CFR 1:101), which can be compounded from natural flavor components obtained by different extraction and synthetic methods.

For Vanilla Flavored Ice Cream (Category II), the CFR is not clear on what constitutes a "predominating" flavor; whether a flavor predominates by flavor intensity or by quantity.

Because vanilla is a defined food, the CFR links the ice cream rules (21 CFR 1:135) to the vanilla rules (21 CFR 1:169) through the three-tiered nomenclature. However, the CFR does not call this out in the ice cream rules. Indeed, vanilla extract is not mentioned in any other part of the ice cream rules.

The industry sought clarification of these rules from the U.S. Food and Drug Administration (FDA). From 1979 to 1983, the FDA provided interpretations and ultimately an advisory opinion that clarified the rules around each category. *However these have not been widely circulated, thus many ice cream manufacturers continue to be unsure about the legal status of their principal display panels.*

Exhibit "B," p.3, "The Use of Vanilla in Ice Cream: Rules, Regulations and Interpretations – All Are Needed For A Thorough Understanding."

86.    The 1983 advisory opinion referenced by Black was issued by Joseph Hile, Associate Commissioner for Regulatory Affairs, and reaffirmed a 1981 advisory opinion, which further confirmed the interpretation in a 1979 letter to industry members:

The Newberry letter is correct under 21 CFR 135.110(e).[39]  Because that section makes no provision for any natural flavors other than natural characterizing flavors, FDA must treat all natural flavors that simulate the characterizing flavor as artificial flavors when deciding what name should appear on the principal display panel.

---

[39] 21 C.F.R. § 135.110(f) was previously 21 C.F.R. § 135.110(e).

Exhibit "D," Advisory Opinion Letter from Hile to industry members, February 9, 1983 ("February 9, 1983 Advisory Opinion") citing Exhibit "E," Letter from R.E. Newberry, Assistant to the Director, Division of Regulatory Guidance, Bureau of Foods to Thompson, October 30, 1979 ("Newberry Letter"); Exhibit "F," Advisory Opinion Letter from Hile to Adams, FEMA President, February 12, 1981 ("February 12, 1981 Advisory Opinion").

87.    Both Hile letters were "specifically identified as [an] advisory opinions," and "represent[s] the formal position of FDA on a matter and except as provided in paragraph (f) of this section, obligates the agency to follow it until it is amended or revoked."  *See* 21 C.F.R. § 10.85(d)(4), 21 C.F.R. § 10.85(e).

88.    While advisory opinions are not a "legal requirement," they provide clarification to a complex labeling regime for vanilla ice cream. *See* 21 C.F.R. § 10.85(j).

V.    The Product Contains Non-Vanilla Flavors Which Simulate, Extend and Enhance Vanilla

89.    That the non-vanilla natural flavor in the Product "simulate[s] the characterizing vanilla flavor" is shown through gas chromatography-mass spectrometry ("GC-MS") analysis.

90.    GC-MS is "the analysis method of choice for smaller and volatile molecules such as benzenes, alcohols and aromatics."[40]

91.    First, the sample is vaporized (the gas phase) and separated into its components by a capillary column "packed with a stationary (solid) phase."

92.    The compounds are "propelled by an inert carrier gas such as argon, helium or nitrogen" where they  separate from each other and "elute from the column at different times, which is generally referred to as their retention times."

93.    After the components exit the GC column, "they are ionized by the mass spectrometer using electron or chemical ionization sources."

---

[40] ThermoFisher Scientific, Gas Chromatography Mass Spectrometry (GC/MS) Information.

94.   Ionized molecules get accelerated through the mass analyzer, which is typically a quadrupole or ion trap.

95.   Then the "ions are separated based on their different mass-to-charge (m/z) ratios."

96.   The last steps "involve ion detection and analysis, with compound peaks appearing as a function of their m/z ratios, with peak heights "proportional to the quantity of the corresponding compound."

97.   A sample will generate "several different peaks, and the final readout will be a mass spectrum" which plots the elution time on the X-axis and the amount or intensity of the compounds on the Y-axis.

98.   Computer databases of mass spectra are used like a DNA database to match the detected compounds based on their m/z ratio.[41]

99.   GC-MS can provide information about the amount and type of vanilla flavorings in a sample through identifying the four vanilla marker compounds and their relative amounts.

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

100.   If the results reveal one or more of the marker compounds is absent or present in an amount inconsistent with the other compounds, this is a sign it was added to the sample by a non-vanilla source.

101.   GC-MS analysis applied to the Wegman's Vanilla Ice Cream generated the below chromatogram and peak assignment table.  Exhibit "G," GC-MS Report, January 7, 2019, p. 6.

---

[41] Id.

21

## Chromatogram



```
TSQA3687
Type: Unknown ID: 1 Row: 1
Sample Name:            Wegmans Vanilla Ice Cream (Production Code: 06218 02:26
                       2943 (1201), DCM Extract, 150C/30min, matrix spiked with
                       w/w 1.0ppm Int. Std. by P&T-TD-GC-MS
Study:
Client:                Sheehan & Associates, P.C., LLN7580
Laboratory:            Mass Spectrometry - Dr. Tom Hartman
Company:
Phone:
Instrument Method:     C:\Xcalibur\methods\voc45solventdelay6min.meth
Processing Method:
Vial:                  1
Injection Volume (µl): 10.00
Sample Weight:         0.00
Sample Volume (µl):    0.00
ISTD Amount:           0.00
Dil Factor:            1.00
```

102.   The peak assignment table identified flavor compounds by matching their m/z ratio with a database of virtually all known compounds. Exhibit "G," GC-MS Report, p. 5.

<u>Peak Assignment Table</u>

**Table 1**

Sheehan & Associates, P.C., Project #7580
Wegmans Vanilla Ice Cream
Production Code: 06218 02:26 2943 (1201)
Methylene Chloride Extract of 10.0 g with 1 ppm Matrix-Spiked Int. Std. by P&T-TD-GC-MS

Data File = TSQA3687

| MS Scan # | Area Integration | Peak Assignment | Conc. PPM w/w |
|---|---|---|---|
| 260 | 846204 | diacetyl | 0.957 |
| 333 | 11141 | propyl acetate | 0.013 |
| 358 | 92411 | acetic acid | 0.104 |
| 435 | 109636 | acetoin | 0.124 |
| 462-496 | 16195208 | 1,2-propylene glycol | 18.310 |
| 504 | 221664 | fufural | 0.251 |
| 530 | 26677 | 3-methylbutyric acid | 0.030 |
| 538 | 9979 | 2-methylbutyric acid | 0.011 |
| 559 | 59440 | fufuryl alcohol | 0.067 |
| 567 | 69274 | dimethylsulfoxide (DMSO) | 0.078 |
| 644 | 3107045 | dimethyl sulfone | 3.513 |
| 676 | 120510 | benzaldehyde | 0.136 |
| 692 | 1431242 | hexanoic acid | 1.618 |
| 707 | 24138 | octanal | 0.027 |
| 760 | 190394 | benzyl alcohol | 0.215 |
| 772 | 179689 | heptanoic acid | 0.203 |
| 782 | 18588 | octyl alcohol | 0.021 |
| 800 | 6138 | 2-nonanone | 0.007 |
| 814 | 159963 | guaiacol + methyl furoate | 0.181 |
| 823 | 78361 | dihydro-3,5-dimethyl-2(3H)-furanone | 0.089 |
| 843 | 180867 | maltol | 0.204 |
| 877 | 1257010 | 2,3-dihydro-3,5-dihydroxy-6-methyl-4H-pyran-4-one (glucose thermal degradation product) | 1.421 |
| 893 | 4105170 | octanoic acid | 4.641 |
| 898 | 66953 | benzoic acid | 0.076 |
| 919 | 47436 | decanal | 0.054 |
| 931 | 884522 | naphthalene-d8 (internal standard) | 1.000 |
| 945 | 201188 | hydroxymethylfurfural (HMF) | 0.227 |
| 970 | 279358 | nonanoic acid | 0.316 |
| 1011 | 104496 | delta-nonalactone | 0.118 |
| 1027 | 77305 | glyceryl triacetate (Triacetin) | 0.087 |
| 1033 | 30115 | 2,4-decadienal | 0.034 |
| 1070 | 4287006 | decanoic acid | 4.847 |
| 1119 | 695713 | vanillin | 0.787 |
| 1143 | 76185 | undecanoic acid | 0.086 |
| 1161 | 41943 | vanillyl ethyl ether | 0.047 |
| 1170 | 4896 | gamma-decalactone | 0.006 |
| 1178 | 14496 | 2-tridecanone | 0.016 |
| 1197 | 247230 | delta-decalactone | 0.280 |
| 1230 | 1377159 | lauric acid | 1.557 |
| 1283 | 7190 | delta-undecalactone | 0.008 |
| 1302 | 14134 | tridecanoic acid | 0.016 |
| 1340 | 58668 | gamma-dodecalactone | 0.066 |
| 1367 | 251726 | delta-dodecalactone | 0.285 |
| 1376 | 65197 | myristoleic acid | 0.074 |
| 1384 | 545835 | myristic acid | 0.617 |
| 1450 | 27826 | phytol isomer | 0.031 |
| 1468 | 8729 | pentadecanoic acid | 0.010 |
| 1532 | 15364 | methyl palmitate | 0.017 |
| 1548 | 24772 | palmitoleic acid | 0.028 |
| 1564 | 207731 | delta-tetradecalactone | 0.235 |
| 1569 | 77789 | palmitic acid | 0.088 |
| 1601 | 13116 | ethyl palmitate | 0.015 |
| 1689 | 6061 | delta-pentadecalactone | 0.007 |
| 1724 | 31567 | delta-hexadecalactone | 0.036 |
| | | **Total (excluding internal standard)** | **42.292** |

103.   The relative amounts of the detected compounds are indicated in columns two (Area Integration) and four (concentration parts per million or "Conc. PPM w/w.").

Case 1:19-cv-09227-LLS Document 10 Filed 03/15/20 Page 24 of 39

104.   Though vanillin (MS Scan # 1119, 0.787 PPM) is detected, p-hydroxybenzaldehyde, p-hydroxybenzoic acid and vanillic acid are not detectable.

105.   The absence of the non-vanillin marker compounds reveals that although the Product may contain some real vanilla, it is not detectable by advanced scientific means and most of the vanillin in the Product is from non-vanilla sources.

106.   The Product also contains maltol (MS Scan # 843, 0.204 PPM), a synthetic flavoring substance which does not "contribute a flavor of its own" but enhances and substitutes for real vanilla, by increasing the sweetness of a food.[42]

107.   Even if the non-vanilla vanillin and maltol are naturally derived, they are "natural flavoring compounds that resemble, simulate and/or enhance vanilla flavor but are not derived from vanilla bean," and thus "would not comply with the intent of the flavor provisions of Category I ice cream." Exhibit "A," Quinn Letter, May 31, 1979.

108.   Non-vanilla vanillin and maltol are often used in ingredients known in the trade as "Vanilla With Other Natural Flavors" or "Vanilla WONF" because these substances enhance, simulate and extend vanilla, allowing the Product to use less real vanilla to achieve the same vanilla taste.

109.   A "product identified as 'Vanilla Ice Cream' is subject to the category 1 ice cream requirements and, therefore, must contain only the characterizing flavor derived from vanilla beans" instead of a vanilla WONF ingredient because "the standard for ice cream does not provide for the label designation of 'With other [natural] flavors' (WONF)." Exhibit "B," Summers Letter, April 10, 1979.

110.   Non-vanilla vanillin and maltol are permitted in Category II or Category III vanilla

---

[42] 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants."); Maltol, UL Prospector, Bryan W. Nash & Sons Ltd.1.

ice cream products as opposed to Category 1, which is the way the Product is represented.

111.   Assuming some of the vanillin in the Product is from the vanilla bean, the Product is a category 2 or category 3 item.

112.   "[N]atural flavors not derived from vanilla beans," like maltol and non-vanilla vanillin, "may be used in combination with the standardized items included under 21 CFR 169 (vanilla-vanillin extract or vanilla-vanillin flavoring) for category II vanilla flavored ice cream provided that the flavoring contributed by or derived from the vanilla beans predominates" and they are fully disclosed as same. Exhibit "H," Letter from Taylor M. Quinn to Kenneth Basa, National Food Ingredient Company, August 22, 1979 ("Quinn Letter, August 22, 1979"); *See* 21 C.F.R. §135.110(f)(2)(ii) ("Category II").

113.   The Product is a Category 3 if the "artificial flavor [from non-vanilla vanillin and maltol] predominates. 21 C.F.R. §135.110(f)(2)(iii) ("Category 3") .

VI.   Defendant's Vanilla Ice Cream Product is Misleading Because it is Labeled and Named Similar to Other Products of Higher Quality

114.   The Product is named identically to competitor products labeled "vanilla ice cream," indicated below.

Competitor Product                    Product




**INGREDIENTS:** CREAM, SKIM MILK, CANE SUGAR, EGG YOLKS, VANILLA EXTRACT.

**INGREDIENTS:** CREAM, SKIM MILK, CANE SUGAR, EGG YOLKS, VANILLA EXTRACT.

**Ingredients:** Milk, Cream, Corn Syrup, Liquid Sugar, Skim Milk, Buttermilk, Milkfat, Whey, Natural Flavor, Mono- and Diglycerides, Guar Gum, Cellulose Gum, Carrageenan, Dextrose, Annatto (color).

115. The competitor product lists "Vanilla Extract" on its ingredient list as opposed to "Natural Flavor."

116. All products are required to be identified and labeled in a way consistent with other products of similar composition.

117. This framework assures consumers will not be misled by the quality and components of similarly labeled products where one product contains a greater amount, type and/or proportion of a characterizing and valuable ingredient.[43]

118. Where two products are identified by the same descriptive terms, "Vanilla Ice Cream," consumers will be deceived into purchasing the product which contains less of the valuable ingredient(s) – vanilla – under the false impression that it contains the equivalent amount of said ingredients or components.

119. Defendant's Product is misleading because it is represented as identical to another product which contains more, and a greater percentage, of the valuable ingredients, which causes consumers to be misled.

VII.    Coloring Misleads Consumers to Expect Products Contain More Vanilla Than They Do

120. The Product contains annatto for coloring purposes, indicated on the ingredient list.

---

[43] *See* 21 C.F.R. § 135.110(f) and 21 C.F.R. § 102.5(a) ("General principles.") ("General principles.") ("The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.").

121.   Annatto is a plant extract often used in cheddar cheese to provide a rich yellow-orange color.

122.   The use of annatto darkens the hue of ice cream to the color indicated below so that it appears as if it contains more vanilla than it actually does.



123.   The darker color makes plaintiffs and consumers less likely to question or be skeptical of the amount and type of vanilla in the Product and expect the Product to be similar to other, accurately labeled vanilla ice creams.

124.   Though coloring for ice cream is specifically authorized, it is not permitted if such coloring is used for a misleading purpose such as making it appear that more of a valuable ingredient is present than is the case.

VIII.   Conclusion

125.   The Product's representations are misleading because it gives the impression it is flavored only from the characterizing vanilla flavor, though it includes flavor not derived from vanilla beans.[44]

126.   The front panel is misleading because it highlights one component of the Product – "Natural Vanilla Flavor" – but fails to point out that most of the vanilla taste experienced by consumers does not come from the "Natural Vanilla Flavor" but from non-vanilla vanillin.

---

[44] 21 C.F.R. § 135.110(f)(2)(i).

127.   The front panel is misleading because it states "No Artificial Flavors" which is a statement that fails to understand that "artificial flavors" does not mean the same thing in ice cream as it does in non-ice cream foods.

128.   In fact, based on the ice cream regulations, the Product contains "artificial flavors" in the form of non-vanilla flavors.

129.   The Product has insufficient vanilla to characterize, *viz*, be the most recognizable flavor, confirmed by the GC-MS analysis.

130.   The detection of vanillin without any of the other vanilla marker compounds reveals a "vanilla ice cream" lacking in vanilla.

131.   Though plaintiffs do not allege the Product has no vanilla, the Product does not contain enough vanilla for advanced scientific testing to reveal the other vanilla marker compounds.

132.   Regardless of how much vanilla the Product has, what matters for "vanilla ice cream" is that all of the flavor come from vanilla and that there is enough vanilla to flavor the Product.

133.   Defendant's representations of the Product are designed to – and does – deceive, mislead, and defraud consumers.

134.   Defendant has sold more of the Product and at higher prices per unit than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

135.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

136.   The value of the Product that Plaintiffs purchased and consumed was materially less than its value as represented by defendant.

137.   Had plaintiffs and class members known the truth, they would not have bought the Products or would have paid less for it.

138.   The Product contains other representations which are misleading and deceptive.

139.   As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $3.79 per 1.5 Quarts, excluding tax, compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

140.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

141.   Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

142.   Plaintiff Quincy Steele is a citizen of Pennsylvania.

143.   Plaintiff Jimmy Arriola is a citizen of New York.

144.   Defendant is a New York corporation with a principal place of business in Rochester, Monroe County, New York and is a citizen of New York

145.   "Minimal diversity" exists because plaintiff Quincy Steele and defendant are citizens of different states.

146.   Minimal diversity exists because plaintiffs seek to represent persons in all states who purchased the Products. *Gonzales v. Agway Energy Services, LLC*, No. 18-cv-235 (N.D.N.Y. Oct. 22, 2018) ("At this time, the allegation that some class member maintains diversity with Defendant is sufficient to establish minimal diversity under CAFA" and citing 28 U.S.C. § 1332(d)(1)(D) "'the term 'class members' means the persons (named or unnamed) who fall within the definition

of the proposed or certified class in a class action.").

147.   Certain exceptions preclude diversity jurisdiction. 28 U.S.C. § 1332(d)(4).

148.   The "local controversy" exception does not apply because less than two-thirds of the putative class members are citizens of New York.

149.   Under the "local controversy" exception, a district court must decline jurisdiction if "more than two-thirds of the putative class members are citizens of the state in which the action was originally filed. *See Green v. Sweetworks Confections, LLC*, No. 18-cv-902 (S.D.N.Y. Aug. 21, 2019) quoting 28 U.S.C. § 1332(d)(4)(A).

150.   At bar, the "local controversy" exception is not satisfied because less than two-thirds of proposed class members are citizens of New York.

151.   This fact can plausibly be alleged because defendant has more than ninety stores across seven states – Maryland, Massachusetts, New York, New Jersey, North Carolina, Pennsylvania and Virginia.

152.   Forty-seven (47) of defendant's stores are located in New York and at least forty-three (43) are located in the states other than New York.

153.   For more than two-thirds of class members to be citizens of New York, defendant would need to get two-thirds (66.6%) of its customers from New York, even though its New York stores comprise 52.2% of its total stores.

154.   Defendant's stores serve a population of 73,103,961 citizens based on the 2019 population estimates contained in the below table.

| State | Population |
|-------|-----------|
| Maryland | 6,042,718 |
| Massachusetts | 6,902,149 |
| New York | 19,542,209 |

| New Jersey | 8,908,520 |
|---|---|
| North Carolina | 10,383,620 |
| Pennsylvania | 12,807,060 |
| Virginia | 8,517,685 |

155. New York contains 26.7% of the population who have defendant's stores in their states.

156. For the local controversy exception to apply, defendant would need to receive more than two-thirds of its customers from a state that contains less than 27% of all possible customers across seven other states.

157. Further, all of defendant's stores in New York, save one which was recently opened in Brooklyn, are located in the less populated region of the State and outside of the populous downstate area including New York City and Long Island.

158. Under the "home state controversy" exception to CAFA, a district court "shall decline to exercise jurisdiction" if "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B).

159. For the same reasons that the local controversy exception does not apply, the home state controversy does not apply.

160. Venue is proper because plaintiff Arriola and many class members reside in this District and defendant does business in this District and State.

161. Under 28 U.S.C. § 1391(c)(2), defendant, a corporation, is considered a resident "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Gen. Elec. Capital Corp. v. Titan Aviation, LLC*, No. 06-cv-4795, 2007 WL 107752, at *6 (S.D.N.Y. Jan. 16, 2007) ("A corporate entity or multi-member

partnership is considered a resident of any district where it is subject to personal jurisdiction.")

162. Since New York has more than one judicial district and defendant is a corporation subject to personal jurisdiction in New York at the time of filing, defendant is "deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(d); *Abergel v. Atlas Recovery Sober Living*, No. 19-cv-6339 (S.D.N.Y. Aug. 19, 2019) ("Where a state has more than one judicial district, a defendant corporation generally "shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State" citing 28 U.S.C. § 1391(d)).

163. Because defendant is deemed to reside in this judicial district, venue is proper in this district. 28 U.S.C. § 1391(b)(1) ("Venue in General. – A civil action may be brought in – (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located").

164. In 2016, defendant's stores had sales of $7.9 billion across all products.

165. Though the Product identified here accounts for a small fraction of defendant's total sales, the large aggregate amount means that even if the Product is a small percentage of the total, it is sufficient to exceed $5,000,000 exclusive of interest and costs. 28 U.S.C. § 1332(d)(6).

166. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

167. A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

168. Plaintiff Quincy Steele is a citizen of Bushkill, Northampton County, Pennsylvania.

169. Plaintiff Jimmy Arriola is a citizen of Bronx, Bronx County, New York.

170.  Defendant Wegmans Food Markets, Inc. is a New York corporation with a principal place of business in Rochester, New York, Monroe County.

171.  During the relevant statutes of limitations, plaintiffs purchased the Product within their districts and/or States for personal consumption and/or use in reliance on the representations the Products consisted only of flavoring from vanilla and did not contain non-vanilla flavor.

<u>Class Allegations</u>

172.  The classes will consist of all purchasers of the Product in New York, Pennsylvania and all other states where defendant has stores selling the Product, during the applicable statutes of limitations.

173.  Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiffs and class members are entitled to damages.

174.  Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

175.  Plaintiffs are adequate representatives because their interests do not conflict with other members.

176.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

177.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

178.  Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

179.  Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350,
Pennsylvania Unfair Trade Practices and Consumer Protection Law
("UTPCPL")  73 P.S. §201-1 et seq.
(Consumer Protection Statutes)

180.  Plaintiffs incorporate by reference all preceding paragraphs.

181.  Plaintiffs and class members desired to purchase, consume and use products or services which were as described and marketed by defendant and expected by reasonable consumers, given the product or service type.

182.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

183.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

184.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

185.  Plaintiffs relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

186.  Plaintiffs  and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

187.  Plaintiffs incorporate by reference all preceding paragraphs.

188.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

189.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

190.   Defendant had a duty to disclose and/or provide non-deceptive marketing of the Products and knew or should have known same were false or misleading.

191.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

192.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

193.  Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

194.  Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

195.  Plaintiffs incorporate by reference all preceding paragraphs.

196.  The Products were manufactured, labeled and sold by defendant and warranted to Plaintiffs and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

197.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and

marketing of the Products.

198.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

199.  Plaintiffs provided notice to defendant, its agents, representatives, retailers and their employees.

200.  Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years.

201.  The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

202.  Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Fraud

203.  Plaintiffs incorporate by reference all preceding paragraphs.

204.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

205.  Defendant's fraudulent intent is evinced by its failure to accurately identify the Products on the front label when it knew this was not true.

206.  Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Unjust Enrichment

207.  Plaintiffs incorporate by reference all preceding paragraphs.

208.  Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiffs demand a jury trial on all issues.

  **WHEREFORE**, Plaintiffs pray for judgment:

1.  Declaring this a proper class action, certifying Plaintiffs as representatives and undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4.  Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   March 15, 2020

                                        Respectfully submitted,

                                        Sheehan & Associates, P.C.
                                        /s/Spencer Sheehan
                                        Spencer Sheehan
                                        505 Northern Blvd Ste 311

Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:19-cv-09227-LLS
United States District Court
Southern District of New York

Quincy Steele, Jimmy Arriola, individually and on behalf of all others similarly situated,

Plaintiffs,

- against -

Wegmans Food Markets, Inc.,

Defendant

## First Amended Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
    Tel: (516) 303-0552
    Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: March 15, 2020

/s/ Spencer Sheehan
Spencer Sheehan